417 So.2d 545 (1982)
Legal Heirs and/or ESTATE OF Wilbert B. BABB, Deceased
v.
GTE SYLVANIA, INC. (Zinsco Electrical Products of Mississippi) and American Motorists Insurance Company.
No. 53262.
Supreme Court of Mississippi.
July 21, 1982.
*546 Charles W. Witt, John C. Underwood, Jr., Taylor, Witt & Underwood, Jackson, for appellant.
Dan McCullen, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, for appellees.
Before WALKER, P.J., and BROOM and ROY NOBLE LEE, JJ.
ROY NOBLE LEE, Justice, for the Court:
William B. Babb filed a claim for workmen's compensation benefits (motion to controvert) on March 9, 1978, alleging that he suffered emotional trauma in the scope of his employment during the period from April 1, 1976, to November 23, 1976. On April 4, 1978, Babb committed suicide by a self-inflicted gunshot wound to the head, and his motion to controvert was revived in the name of his estate. On August 11, 1978, Mrs. Sara Babb, his widow and only dependent, filed a second motion to controvert, seeking compensation benefits as a result of his death. The employer/carrier, GTE Sylvania, Inc. [GTE] and American Motorist Insurance Company, filed separate answers.
The hearing was held before an administrative judge, who heard lay and medical testimony, found that Babb's injury was causally connected to his employment, and awarded compensation benefits. The employer/carrier appealed to the full Commission which reversed the administrative judge's order, holding that Babb's injury and death were not shown by clear evidence to be causally connected with his employment. The claimant appealed to the Circuit Court of the First Judicial District of Hinds County, Honorable William F. Coleman, presiding, which court affirmed the order of the full Commission, and the claimant has appealed here.

I.
The claimant contends that the findings and order of the Mississippi Workmen's Compensation Commission are contrary to law and are not supported by substantial evidence, and the judgment of the lower court and the order of the Workmen's Compensation Commission should be reversed.
Babb was a married male, who was born August 1, 1930. He started working for Presto Manufacturing Company in 1957 on an assembly-line operation making small appliances, and later became supervisor in the assembly line. He left Presto in 1969 and went to work for Zinsco as foreman on the assembly line. Zinsco was in the business of manufacturing electrical distribution equipment and transformers and was purchased by GTE Sylvania, Inc. about 1974. Babb continued as an assembly-line foreman for GTE.
Babb had suffered physical disabilities through the years as follows:
(1) Lumbar disc surgery in May, 1957.
(2) Lumbar disc surgery in September, 1974.
(3) Chronic peptic ulcer disease since the mid-1950's with confinement at Doctors' Hospital for ulcer problems in 1958, 1970, 1974, and 1975.
(4) In August, 1975, he suffered perforation of the ilium because of a lodged fishbone *547 and suffered an exploratory laparotomy and removal of a part of the small bowel.
(5) Hospitalization from January 12 to January 27, 1976, with a chronic duodenal ulcer, which necessitated surgical procedure.
(6) Hospitalization at St. Dominic's-Jackson Memorial Hospital from May 11 to May 16, 1976, for a heart problem.
When Babb had the surgical procedure January 12, 1976, he took a leave of absence from January 12 until March 15, 1976, aggregating nine (9) weeks. He was on sick leave again from May 17 through June 11, 1976, missing four (4) weeks. On his return to work, he was transferred from a special work project in the stockroom, where he was employed at the time of his illness, to the Quality Control Department, where he worked until he left the employ of the company around Thanksgiving, 1976.
Appellants contend that Babb sustained a compensable injury which was caused by pressures of work from April 1 to November 23, 1976.[1] Evidence, both lay and expert, for appellant and appellee are in conflict. The appellant introduced Dr. James Edward Ruff, a psychiatrist, as an expert witness and an attending physician of Babb. He first examined Babb upon referral of Dr. James Crosthwait, a cardiologist, and followed the patient until his death. Dr. Ruff testified that, in his opinion, Babb's psychological difficulties had rendered him permanently and totally disabled by February, 1977, and he causally-connected Babb's psychological disorders to the stresses with which deceased had to deal, primarily, the stress from his job. He also testified that Babb's mental disorder and ultimate suicide were probably causally-connected to the problems he encountered in his work activities with GTE and that Babb was probably not responsible for his actions at the time of his suicide.
Dr. Richard W. Naef never examined Babb, but he reviewed twelve (12) exhibits, including hospital records, which will be enumerated hereafter, and expressed the opinion there was no causal connection between Babb's mental condition and subsequent death, and his employment. The Commission's order denying compensation benefits was based in large part upon the testimony of Dr. Naef. The Commission made the following finding on that testimony:
Dr. Richard W. Naef, a psychiatrist and neurosurgeon, testified based on his examination of various exhibits introduced in this cause.[10] From his review of the exhibits, which reflect the extensive and prolonged history of deceased's medical and psychological problems, Dr. Naef testified deceased had been an extremely anxious person throughout his adult life and suffered numerous physical disorders, some of which were psychogenic in origin. He testified deceased regressed in 1976 into a pronounced mental and emotional illness, displaying extreme anxiety, maladaptive behavior and neurotic manifestations of emotional disturbance.
According to Dr. Naef, deceased became increasingly ill and depressed, and his depression, along with his inability to cope with his physical illnesses, family problems and financial difficulties, led deceased to choose suicide as a solution to his problems.
Dr. Naef testified deceased had psycho-physiologic gastrointestinal disorder and duodenal-peptic ulcer disease since 24 years of age. In April, 1975, six months after deceased's back surgery, deceased developed serious complications from the ulcer and required hospitalization. In June, 1975, deceased required emergency surgery because of an accidental perforation of the ilium by a fish bone. In Dr. Naef's opinion, this emergency surgery was an unexpected source of stress which heightened deceased's concern for his health. Six months later, deceased again developed serious complications from his chronic duodenal ulcer requiring surgery to re-section the vegas nerves and decrease *548 acid production in the stomach. Five months later, May, 1976, deceased was hospitalized for substernal chest pain. At that time, deceased suffered not only "cardiac neurosis" (an unrealistic fear of having heart disease) but other symptoms as well; weight loss, generalized weakness, lack of stamina and recurring chronic epigastric pain.
Dr. Naef testified that, in his opinion, deceased's behavior in response to his illnesses indicated severe personality disorder. Deceased was unable to train himself to alter his eating habits to maintain adequate nutrition, and he became malnourished from not eating enough. When he did eat there was a dumping effect: Food would not remain in the stomach long enough for proper digestion at the first level of digestion and food material was dumped into the small intestine causing hyperaction in the intestines which resulted in poor absorption, discomfort, diarrhea and loss of weight. Dr. Naef testified these problems caused deceased to become discouraged, impatient and frustrated. Deceased lacked understanding and acceptance of this disease. He was unable to make the intellectual effort of self-discipline and remain calm enough to eat, digest his food and continue persistent management of nutrition.
Due to deceased's surgeries for the back injury and the puncture of his intestine, plus the psychosomatic illnesses with physical manifestations, he lost an excessive amount of time from work from mid 1975 to mid 1976. Dr. Naef testified deceased's excessive absenteeism had an effect on his sense of security. Although the defendant allowed deceased to return to work, provided him with hospital insurance and even gave him a week's vacation after he had been absent for illness numerous weeks in the same year, deceased still developed a great amount of anxiety and an increasing fear of losing his job. Based on the facts provided by Dr. Naef, he testified deceased's job was not actually threatened, but deceased, on his own, developed the "concept" that his position with defendant was threatened. Dr. Naef testified that deceased's feelings of insecurity about his work, along with his uncertainty about his ability to recover from prolonged physical problems and his inability to cope with family and financial problems, finally led to deceased's depression. Dr. Naef testified as to the effect of deceased's physical ailments on his job performance.
"I think his state of health is what caused his inability to cope with those different job classifications. I think he probably had the basic experience and knowledge to do any of those three jobs. But I think he was so ill by that time anxious and suffering with so many physical symptoms that he was not free to give his best qualifications to the work. He would then misinterpret the requirements of the work, and the relationship between him and other people at work.
* * * * * *
I don't see that the change of job classifications, which have different duties in each position, would be a very important factor in causing his illness. I think his illness, and his personality, and his state of mind, his attitude, his lack of self-confidence, his insecure sense of having failed at so many things, and lost so much time at work, and still suffering with so much illness, the disappointment of not being well after gastrectomy, I think all of those factors made him unable to cope with the job... . I think they could have moved him back into almost any position and he still would have been unable to copy with ... the responsibilities."
Dr. Naef testified that the depression which eventually led to deceased's suicide grew out of his inadequate personality. Deceased displayed a weakness of character which made it difficult for him to cope with routine problems of living, unexpected adverse circumstances and a variety of true physical illnesses. He was unable to make mature adjustments and deteriorated into a neurotic state of maladaptive behavior with anxiety and then *549 finally depression and suicide. Dr. Naef did not agree with Dr. Ruff that deceased's job caused deceased's illness but rather concluded that deceased's illness made it impossible for him to cope with his job.
Dr. Naef stated that deceased's suicide note was consistent with his personality. Dr. Naef stated:
"That's a clear statement that he loves his family. He's not killing himself because he hates them. He's not blaming them as implied by this statement. `I love you all very much, but I can't live in this misery', meaning that he had become utterly frustrated, and hopeless, and helpless, and unloveable, and that he thought it was the best solution to the whole misery, to the whole miserable real-life situation.
* * * * * *
He couldn't master [sic] together the ability to cope, and make life any better, and I think he concluded that the family would be better off without him."
[10] The exhibits which Dr. Naef examined were:
Exhibit 2  A copy of deceased's Certificate of Death
Exhibit 3  Copy of out-patient notes of Dr. Ruff from September 9, 1976, through March 6, 1978
Exhibit 8  Copy of Defendant's 1976 Salary Attendance Record
Exhibit 9  Copy of defendant's 1975 Salary Attendance Record
Exhibit 10  Copy of letter signed by Mr. Phillip Patton dated April 22, 1977
Exhibit 11  Copy of the Company Confidential Salary Information Form
Exhibit 15  Copy of Hospital records from Baptist Hospital, first admission August 27, 1974, second admission April 7, 1975, third admission June 12, 1975
Exhibit 16  Copy of hospital records from Doctor's Hospital commencing January 12, 1976
Exhibit 17  Copy of hospital records from St. Dominic's Hospital commencing May 11, 1976
Exhibit 18  Copy of hospital records from St. Dominic's Hospital commencing November 29, 1976
Exhibit 19  Copy of hospital records from St. Dominic's Hospital commencing February 11, 1977
Exhibit 20  Copies of hospital records from Veterans Administration Hospital, first admission August, 1976, second admission July, 1977
Babb was hospitalized at the Veterans' Administration Hospital in Jackson first on August 16, 1976. During periods of hospitalization, the following history and notations on the records were indicated at the VA Hospital:
He described himself as being a nervous person and upon the history he expressed concern over the amount of work that his wife does and that it was killing her. He had feelings of worthlessness and guilt and he reports early morning sleep disturbance with minimal activity during the day. He reports that he would come home from work in the afternoons and head straight for the couch with no interest in his family or outside activities. He also reported loss of sexual appetite and that he has no satisfaction in his sex life. He has had a weight loss of 20 lbs. since his operation in January.
* * * * * *
Patient reports periods of depression expressing concern over the past series medical operation which he believes is responsible for his condition (due to their stress). He expressed concern over the amount his wife works and that "it is killing her." He has feelings of worthlessness in his condition requiring his wife to work hard to support.
He reports an early morning sleep disturbance but ponders no thoughts during these times. His activity is minimal, coming in after work and heading "straight for the couch."
In Hemphill Drug Co. v. Mann, 274 So.2d 117 (Miss. 1973), the Court said:
There is a considerable body of authority to support the proposition that the findings of fact of the Workmen's Compensation Commission must be upheld so long as those findings are supported by substantial evidence.
* * * * * *
In determining whether or not there is "clear evidence" of a causal connection, *550 the Workmen's Compensation Commission has the discretion to determine the probative value of expert medical testimony. In Miller Transporters, Ltd. [v. Reeves, 195 So.2d 95 (Miss. 1967)], supra, this Court held:
"The probative value of medical testimony is for the fact finding tribunal to decide. 100 C.J.S. Workmen's Compensation § 555(5)c, p. 676; and cases cited. `The mere expression of a medical opinion couched in somewhat equivocal language may not always be grasped as a substitute for fair and substantial evidence in the field of mental illness, and if testimony of an expert witness is unconvincing, his conclusions need not be accepted. 100 C.J.S. Workmen's Compensation § 555(15), pp. 721, 722.' [Johnson v. Gulfport Laundry & Cleaning Co.], 249 Miss. [11] at 21, 162 So.2d [859] at 863.
* * * * * *
... [T]he determination of facts is clearly within the province of the commission." 195 So.2d at 100. [274 So.2d at 119, 120].
In Malley v. Over-the-Top, 229 Miss. 347, 90 So.2d 678 (1956), the Court said:
Accordingly, we hold that the Commission itself is the trier of facts and any question of fact decided by it is conclusive on appeal if it is supported by substantial evidence. It follows that the judgment should be and is affirmed. [229 Miss. at 355, 90 So.2d at 681].
See also Segar v. Garan, Inc., 388 So.2d 164 (Miss. 1980); Holloway v. Prassell Enterprises, Inc., 348 So.2d 771 (Miss. 1977); and Brown v. F.W. Woolworth Co., 348 So.2d 236 (Miss. 1977).
We are of the opinion that the findings and order of the Workmen's Compensation Commission were supported by substantial evidence and that the lower court was eminently correct in affirming that order.

II.
The parties concede and agree that the Workmen's Compensation law in Mississippi, as interpreted, requires a physical injury or traumatic impact which results in the mental condition. However, in view of our decision on the facts related in Section I hereinabove, it is not necessary for us to address that question.
For the reasons stated, the judgment of the lower court is affirmed.
AFFIRMED.
PATTERSON, C.J., SUGG and WALKER, P. JJ., and BROOM, BOWLING, HAWKINS and DAN LEE, JJ., concur.
PRATHER, J., takes no part.
NOTES
[1] The record indicates that from April 1 through mid-September, 1976, Babb worked only nine (9) weeks because of unrelated physical infirmities and one (1) week of vacation.